**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) No. 17 CR 455-3 |
| | ) |
| ANGELITA NEWTON, | ) Judge Virginia M. Kendall |
| | ) |
| *Defendant*. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Defendant Angelita Newton was charged by Superseding Indictment with one count of conspiracy to commit wire fraud and health care fraud in violation of 18 U.S.C. § 1349 ("Count One"). (Dkt. 147). Following a five-day trial, a jury convicted Newton. (Dkt. 186). Newton has filed a Motion for Judgement of Acquittal and Motion for a New Trial. (Dkt. 243). For the reasons explained below, Newton's motion [243] is denied. The jury's verdict stands.

## BACKGROUND

Newton is a former employee of Care Specialists, Inc. ("Care Specialists"), a home health agency operated by Mr. Ferdinand Echavia and Mrs. Maria Luis Echavia. (*E.g.*, Trial Tr. at 271:11–13 (noting Mr. Echavia's ownership of Care Specialists), 279:11–19 (noting transfer of ownership to Mrs. Echavia); *see also id.* at 468:19–21 (witness explaining that Care Specialists is a "home health agency that provides services to patients at home)). Newton worked at Care Specialists between about 2011 and 2017 as both a secretary to Mr. Echavia and a quality assurance employee (or "QA"). (*E.g.*, *id.* at 7:11–13, 570:14–19). While QAs were generally responsible

1

for reviewing nurses' patient visit notes for completeness and accuracy alone, (*id.* at 385:8–19), Newton's role also notably included *drafting* Mr. Echavia's visit notes, (*id.* at 570:14–571:2).

In December 2019, Newton and the Echavias were charged by Superseding Indictment with conspiracy to commit health care fraud and wire fraud in violation of 18 U.S.C. § 1349. (*See generally* Dkt. 147). The Government alleged that over many years, the defendants (1) submitted claims to Medicare for home health care services that were medically unnecessary or never provided at all; (2) concealed the submission of such false and fraudulent claims to Medicare; (3) paid kickbacks to patients for their participation in this scheme; and (4) diverted the resulting proceeds for their personal use and benefit. (*Id.* at 5). The Echavias both pled guilty to the Superseding Indictment. (*See* Dkts. 173, 175). Newton proceeded to trial on February 10, 2020. (Dkt. 178).

At Newton's trial, the jury heard from a variety of witnesses during the Government's case: (1) Bambi Molyneux, an expert witness on Medicare regulations and policies for home health services; (2) Reginald Onate, the government's cooperating witness who previously worked as a nurse at Care Specialists; (3) several individuals who Care Specialists falsely claimed as patients to Medicare, and who received kickbacks from Mr. Echavia – including Joseph Davis, Michael Maiden, Melvin Meeks, and Curtis Williams; (4) Fia Rivera, who worked as a biller at Care Specialists; (5) Melanie Onal, who worked as a QA for Care Specialists; (6) Michelle Santos, another former Care Specialists QA; (7) Anthony Demata, a previous Care Specialists employee who worked off jobs around the office; and (8) Special Agent Loan Bermudez, who aided in the Government's investigation of this case. (*See generally* Dkt. 243 at 4–9). The Government presented extensive evidence of the conspiracy at Care Specialists to inflate Medicare payouts by, for example, misrepresenting patients' conditions and the medical care they received. (*See, e.g.*,

Trial Tr. at 373:10–374:19). The Government adduced evidence showing that the defendants also manufactured medical records to conceal the fraudulent nature of their Medicare claims. (*E.g.*, *id.* at 493:20–494:23). Several witnesses implicated Newton in the charged conspiracy. For example, testimony showed that Newton often wrote Mr. Echavia's patient visit notes that would ultimately be used in support of the false Medicare claims. (*E.g.*, *id.* at 479:3–9; *see also id.* at 651:25–562:5 (witness noting that it was standard practice for QAs to write patient visit notes)). Testimony also revealed that Mr. Echavia provided Newton with barebones outlines for these patient visit notes. His notes merely listed basic vital signs which Newton would transform into detailed, "head-to-toe" assessments of patient health. (*Id.* at 657:18–660:7; *see also id.* at 650:23–651:21 (witness explaining that such "head-to-toe" assessments included descriptions of a patient's "pain, their gastrointestinal assessments, respiratory, musculoskeletal, cardiovascular, joint pain, nutrition, endocrine, [and] emotional" health, as well as the treating nurse's "nursing interventions, instructions, and teachings")). The Government argued that Newton thus agreed to "make up content for [Mr. Echavia] without having seen the patient." (*Id.* at 755:3–756:6). In addition, the Government produced a recorded custodial interview of Newton in which she claimed that she *never* wrote patient notes for Mr. Echavia – a claim overwhelmingly controverted by the trial record. (*Id.* at 766:11–769:1).

Newton exercised her right not testify in her defense. (Trial Tr. 797:3–5). She initially planned to present the testimony of Norma Bolender, a former QA at Care Specialists. (*See* Dkt. 243 at 3). However, Bolender invoked the Fifth Amendment prior to taking the stand. (Trial Tr. 591:24–592:2). The defense ultimately called no witnesses at trial. (*See id.* at 742:11–12).

On February 14, 2020, after five days of trial, a jury convicted Newton of one count of conspiracy to commit health care fraud and wire fraud. (Dkt. 186). Newton has now briefed Rule

29 and Rule 33 motions for a judgment of acquittal and a new trial. (*See* Dkt. 243). Newton argues that the evidence was insufficient for a rational jury to conclude, beyond a reasonable doubt, that she was aware of and agreed to participate in the conspiracy at Care Specialists. (*See, e.g.*, *id.* at 31). She also alleges various errors throughout the trial that, she argues, warrant a new trial should the Court consider the government's evidence sufficient under the Rule 29 standard. (*Id.* at 10, 36–38).

## DISCUSSION

### I. Rule 29 Motion for Judgment of Acquittal

#### A. Legal Standard

Federal Rule of Criminal Procedure 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." *See United States v. Kohli*, 847 F.3d 483, 489 (7th Cir. 2017). A court will overturn the jury's verdict only if, "after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Wrobel*, 841 F.3d 450, 454 (7th Cir. 2016) (quoting *United States v. Campbell*, 770 F.3d 556, 571–72 (7th Cir. 2014)); *see also United States v. Kruse*, 606 F.3d 404, 408 n.1 (7th Cir. 2010) ("[W]e shall affirm if the evidence, taken in the light most favorable to the Government, is sufficient to prove all elements of the crime beyond a reasonable doubt."); *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (explaining same); *but see United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018) (noting that, for this inquiry, the court examines the evidence as a whole, including that presented by the defendant). In other words, a court will "set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is

4

weighed,' from which a jury could have returned a conviction." *Presbitero*, 569 F.3d at 704 (quoting *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008)). *See also United States v. Shorter*, 874 F.3d 969, 977 (7th Cir. 2017) (citing *United States v. Bek*, 493 F.3d 790, 798 (7th Cir. 2007)) (same).

"In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010) (citation omitted); *see also United States v. LeBeau*, 949 F.3d 334, 346 (7th Cir. 2020); *cf. United States v. Jones*, 713 F.3d 336, 339–40 (7th Cir. 2013) (explaining that "the height of the hurdle depends directly on the strength of the government's evidence"). In other words, a "defendant faces an uphill battle in challenging the sufficiency of the evidence." *United States v. Orlando*, 819 F.3d 1016, 1021 (7th Cir. 2016). It follows that under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009); *see also United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009). Instead, "[s]orting the facts and inferences is a task for the jury." *Warren*, 593 F.3d at 547. "[A] verdict may be rational even if it relies solely on circumstantial evidence." *Kruse*, 606 F.3d at 408 (citing *Warren*, 593 F.3d at 547); *see also, e.g.*, *United States v. Freed*, No. 13-cr-951, 2016 WL 6618517, at *2 (N.D. Ill. Nov. 9, 2016) ("The Government may prove intent to defraud using circumstantial evidence and inferences drawn from the scheme itself.").

**B. Discussion**

Count One of the Superseding Indictment charged Newton with conspiring to commit health care and wire fraud with the Echavias and an unnamed co-conspirator in violation of 18 U.S.C. § 1349. (Dkt. 147). To convict a defendant of conspiracy, the government must prove beyond a reasonable doubt that the defendant "knowingly and intentionally joined in an agreement

with one or more other individuals to commit an unlawful act." *Orlando*, 819 F.3d at 1022 (quoting *United States v. Avila*, 557 F.3d 809, 815 (7th Cir. 2009)). Accordingly, the government had to show that Newton knew the essential nature and scope of the charged conspiracy and that she intended to participate in it. *Orlando*, 819 F.3d at 1022. *See also United States v. Garten*, 777 F.3d 392, 399–400 (7th Cir. 2015) (citing *United States v. Anderson*, 580 F.3d 639, 646 (7th Cir.2009)) (explaining same in § 1349 case). In this case, the jury was asked to find whether (1) the conspiracy as charged in Count One existed, and (2) the defendant knowingly became a member of the conspiracy with the intent to advance the conspiracy. (*See* Dkt. 183 at 21; *see also* Seventh Cir. Pattern Criminal Jury Instruction 5.08(b)).

Newton argues that there is insufficient evidence to sustain her conviction. (*See* Dkt. 243 at 27–36). Specifically, she sets forth numerous challenges to the jury's finding on the second element of her charge – that she was aware of and agreed to participate in the conspiracy at Care Specialists. Viewing the evidence in the Government's favor as required on this motion for acquittal, a rational trier of fact could have concluded that the elements of conspiracy were established beyond a reasonable doubt.

To begin, the jury heard testimony of Reginald Onate, who pled guilty for his role in the underlying Medicare fraud scheme. (*Id.* at 325:5–24). Onate worked as a field nurse at Care Specialists for over two years. (*Id.* at 324:1–9, 335:8–11). In this role, he provided medical services to patients and completed paperwork documenting his patient visits for Care Specialists' records. (*Id.* at 333:7–18, 336:2–10, 372:9–15 (Onate stating that he kept week-to-week visit notes about his patents)). Onate also shed light on the nature of the fraud charged in the indictment. For instance, he estimated that approximately 90 percent of his patients were not technically eligible to receive at-home health care services under Medicare. (*Id.* at 336:17–367:20 (noting that

Medicare rules required his patients to be "homebound" – meaning they were unable to leave their homes for medical treatment – but that almost none of his patients met that requirement); *see also id.* at 338:8–17).

Onate recalled that Newton "work[ed] closely" and shared an office with Mrs. Echavia. (*Id.* at 329:2–11, 332:11–21). He detailed a specific incident involving Newton and Mrs. Echavia that occurred in 2015 prior to a "very important" company audit. (*Id.* at 366:8–16 (also noting that Onate was unaware of the precise nature of the audit, but that "a bunch of [his] notes had to be reviewed" prior to its occurrence); *see also id.* at 617:19–622:12 (Onal testifying that home health agencies, including Care Specialists, are audited or "surveyed" by state- or private-run entities every three years; that the Illinois Department of Public Health conducted one such audit; and that the Illinois Department of Public Health discovered "pre-signed notes" in a patient's chart)). At that time, Mrs. Echavia requested access to Onate's electronic patient visit notes, and Onate provided her Mrs. Echavia his login information. (*Id.* at 369:24–370:14). Newton later sent Onate a text informing him "that the papers were complete" and asked him to finalize the paperwork. (*Id.* at 369:11–15, 371:11–18). Upon logging in to his account, Onate noticed that his patient notes had been altered. (*Id.* at 369:20, 371:19–24 (Onate testifying that the notes he signed off on "were different" after Newton told him they were finalized)). More specifically, Newton and Mrs. Echavia directed Onate to sign off on records that made his patients' conditions look "worse" than they had before in advance of the audit. (*See id.* at 373:10–13).

The government also called Fia Rivera to the stand. Rivera worked at Care Specialists and, in relevant part, served as a biller for the company. (*Id.* at 468:16–18, 471:15–472:3). In that role she reviewed and submitted documents related to Care Specialists' Medicare claims. (*Id.* at 472:4–6, 477:13–21; *see also id.* at 485:24–488:12 (Rivera explaining the Medicare billing process)).

Rivera explained that Medicare rejected the company's claims once or twice each month because of "inpatient overlap" issues. (*Id.* at 488:18–489:12, 490:6–12). Claims are rejected due to inpatient overlap when claims to have seen a patient at home on a particular date, but "the patient [was] actually admitted in a hospital or another facility" at that time. (*Id.* at 489:15–22). Moreover, per Rivera, all of the inpatient overlap rejections she handles stemmed exclusively from claims filed on behalf of Mr. Echavia. (*Id.* at 490:21–491:3). Each time Mr. Echavia's claims were rejected as such, Rivera notified his QAs – Newton and Norma Bolender – so that they could review and amend the documents as necessary. (*Id.* at 491:4–12, 492:7–493:4, 497:8–9, 515:8–14). Rivera provided notice to Newton about these filing deficiencies on several occasions. (*Id.* at 547:9–13). Newton therefore possessed knowledge of the recurring inpatient overlap issues affecting Mr. Echavia's claims.

Rivera explained that after she notified Newton and Mrs. Echavia about Medicare claim rejections, the patient notes and supposed visit dates on these files were then amended and resubmitted to the government. (*Id.* at 494:10–495:3 (stating that rejected claims were revised and resubmitted to secure government payouts), 535:13–18 (noting that when Care Specialists resubmitted revised claims, "they got paid")). She also walked the jury through specific examples of patient files that were modified in this way. (*Id.* at 516:8–530:22 (providing detailed information about Medicare claim documents pertaining to patient Burbridge, which were rejected due to inpatient overlap and retroactively amended), 531:3–536:23 (same regarding patient Burnett's files)). In its closing argument, Government aptly summarized Rivera's testimony about patient files being altered after Medicare rejected reimbursement claims. It stated the following, in part:

> In addition to the changes to the visit notes, you also heard about the creation of backdated documents purporting to reflect that Care Specialists knew that the

> patient was hospitalized at the time of the hospitalization. . . . Fia Rivera showed
> you that there were . . . documents . . . that were added to the [Burbridge] file after
> [it was rejected by Medicare due to inpatient overlap] but <u>dated as if they had been
> completed beforehand</u>. And, likewise . . . [Rivera] showed you that the visit note
> [in Burnett's file] that conflicts with the hospitalization was removed from the file
> that was recovered from the search, and then, again, those three <u>backdated
> documents added</u> to the bottom of the file.

(*Id.* at 764:17–765:9 (emphasis added)). Rivera testified that although the errors resulting in

Medicare denials initially appeared to be mere clerical oversights, she eventually "refused and

stopped . . . resubmitting the claims" because "it became like a pattern that there is an inpatient

overlap [issue affecting] the same nurse." (*Id.* at 495:4–21; *see also id.* at 536:25–537:7 (same)).

"It became a question to me [as to whether or not] . . . this nurse[, Ferdinand Echavia, was] really

[seeing] the patient[s] . . . at home[,] because of these consistent rejections I got from . . . submitting

the claims." (*Id.* at 495:22–496:2). In other words, it became a matter of common sense for Rivera

that there could be no innocent explanation for these events.

Rivera's testimony further revealed that Newton was not only *aware* that Mr. Echavia's

Medicare claims regularly suffered from inpatient overlap issues – but that Newton had a direct

hand in *drafting* those faulty documents. Rivera reviewed "[m]aybe over a thousand" medical

claim documents, (*id.* at 478:4–7 (noting she reviewed "[t]oo many [documents] to recall")), which

included handwritten notes prepared by Care Specialists employees, (*id.* at 478:9–11). Rivera

eventually became familiar with her colleagues' handwriting, including Newton's and Mr.

Echavia's. (*Id.* at 478:9–24). Her testimony revealed that when she received patient notes signed

by Mr. Echavia, the body of those notes was typically written in <u>Newton's</u> handwriting. (*Id.* at

479:3–6). She estimated that "70 to 80 percent" of notes signed by Mr. Echavia were in fact

written by Newton. (*Id.* at 479:7–9). Moreover, Rivera discussed a number of forms that were

written by Newton, signed by Mr. Echavia, and rejected by Medicare due to inpatient overlap

concerns.  (*E.g.*, *id.* at 516:19–517:21, 540:14–542:19).  By contrast, Rivera testified that Newton's official job duties as a QA were generally limited to mere *review* of patient files.  (*Id.* at 475:15–476:18).

Other witnesses corroborated that it was unusual for a QA to complete patient visit notes in this manner.  This included Michelle Santos, who previously worked as a QA at Care Specialists.  (*Id.* at 649:23–24).  Santos understood that nurses were supposed to complete their own patient visit notes, (*id.* at 654:21–24), and that QAs provided administrative support by reviewing these notes for completeness alone, (*id.* at 650:1–21, 651:22–24; *see also id.* at 651:2–21 (articulating various details that nurses were required to document in their standard-form visit notes, which QAs then reviewed for completeness)).  Santos stated that she never once wrote patient visit notes on behalf of an attending nurse.  (*Id.* at 652:6–7).  When asked how she would treat a blank patient file – like the ones signed by Mr. Echavia and provided to Newton – Santos explained that she "would have to submit [it] back to [the nurse], and [the nurse would] have to fill it out."  (*Id.* at 651:25–562:5).  By contrast, Santos observed Newton completing patient visit forms on Mr. Echavia's behalf.  (*Id.* at 657:6–10, 658:8–23).  She described how Mr. Echavia provided Newton with barebone notes concerning patient visits on scrap paper, (*id.* at 657:18–660:1), which Newton used to craft "detailed descriptions" of Mr. Echavia's nursing interventions and "full head-to-toe assessments of [his] patient[s]," (*id.* at 660:2–7; *see also id.* at 650:23–651:21 (explaining that such "head-to-toe" assessments included descriptions of a patient's "pain, their gastrointestinal assessments, respiratory, musculoskeletal, cardiovascular, joint pain, nutrition, endocrine, [and] emotional" health, as well as the treating nurse's "nursing interventions, instructions, and teachings")).

Anthony Demata – an office worker at Care Specialists, (*id.* at 675:2–10 (explaining that Demata did "a little bit of everything," from janitorial to secretarial work) – also recalled seeing Newton completing blank forms bearing Mr. Echavia's signature. (*Id.* at 679:1–680:2). In fact, he witnessed Newton completing these forms "all the time." (*Id.* at 680:4). Melanie Onal, another QA at Care Specialists, similarly testified that Newton "wr[ote] skilled nursing notes for specific patients" daily. (*Id.* at 606:7–20, 607:8–15; *see also id.* at 608:2–613:8 (identifying Newton's handwriting on more than fifty pages of patient visit forms)). Onal never observed other employees filling out nurses' patient visit notes in this manner. (*Id.* at 607:16–21). She also described an incident wherein the Care Specialists' Director of Nursing, Jeanne Madriaga, expressed her concerns about Newton completing Mr. Echavia's patient visit notes. (*Id.* at 615:23–617:11). Newton's level of involvement in drafting these notes under Mr. Echavia's direction was plainly not the normal practice for legal medical care under the Medicare regulations. From this evidence, a rational jury could infer that Newton's intended to further the goals of the conspiracy. Newton's arguments to the contrary cannot overcome the jury's permissible inference on this point.

The government elicited still other evidence at trial that supported the jury's finding of guilt. For example, Rivera highlighted that Newton worked as a secretary to Mr. Echavia in addition to her role as a QA. (*Id.* at 481:12–16). Per Rivera, company policy directed that Newton "would be the one answering the phone concerning . . . [Mr. Echavia's] patients." (*Id.* at 484:1–3). In addition, employees at Care Specialists were required to "communicate to [Newton] anything that pertain[ed] to . . . phone calls about [Mr. Echavia's] patients." (*Id.* at 481:17–23; *see also id.* at 484:22–485:8 (explaining company policy that "anything that concerns . . . [a] phone call for [Ferdinand Echavia], we have to give it to or transfer it to [Newton or Mrs. Echavia]" and

not engage in conversation with the patient), 578:22–579:3 (explaining same)). Rivera recalled that Mr. Echavia's patients sometimes called asking for money and employees transferred these calls to either Newton or Mrs. Echavia. (*Id.* at 484:15–21). Similarly, Onate explained that he spoke to Newton on more than one occasion about patients asking for money. (*Id.* at 350:13–352:23 ("I recall at the time just being anxious . . . . I had to say that I didn't want to visit any more patients . . . that were being dealt any money . . . . I have voiced . . . my concerns [about patients asking for money] to multiple people in that office, [Newton] being one of them.")). Note that Bambi Molyneux, the Government's expert on Medicare regulations and policies for home health services, informed the jury that Medicare often will not pay claims when kickbacks are involved. (*Id.* at 283:24–284:16 (explaining, for instance, that Medicare will not pay claims for services rendered to patients paid to accept services)).

Newton's own statements during a recorded custodial interview with law enforcement agents – and played in open court – further supported the jury's verdict in this case. In the interview, Newton admitted she knew about her employer's practice of illegally compensating its patients. (*See id.* at 736:21–24, 756:25–757:5 (quoting Newton's statement that "all of the people at work" told her that Mr. Echavia "was paying patients"), 757:6–758:1 (quoting Newton's statement that she "of course" knew it was illegal to pay patients as such); Gov. Trial Exs. 317R, 319R). The interview also reveals that Newton knew that Care Specialists falsified patient medical records. (*See, e.g.*, Trial Tr. at 763:2–764:2 (referring to Newton's statement that Mr. Echavia altered patient files when Medicare rejected claims due to inpatient overlap issues); Gov. Trial Exs. 317R, 319R, 324R). Finally, Newton asserted in the interview that she <u>never</u> filled in patient visit notes on Mr. Echavia's behalf – a claim that was directly contradicted by several Government witnesses at trial, as detailed above. (*See* Trial Tr. at 767:4–769:1 (quoting Newton's repeated

assertions that she never completed visit notes for Mr. Echavia); Gov. Ex. 322R). Newton's attempt to conceal or minimize her involvement with the conspiracy as such provided additional basis for the jury to infer her involvement therein. *See, e.g.*, *United Stated v. Taylor*, No. 17-cr-658-2, 2019 WL 4410279, at *3 (N.D. Ill. Sept. 16, 2019) ("[T]he jury could infer [Defendant's] intent to defraud from the fact that he misled the FBI during its investigation.") (citing *United States v. Jackson*, 860 F.3d 438, 446 (7th Cir. 2017)).

Ultimately, a conviction must be affirmed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). *See also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) ("[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."); *United States v. Godinez*, 7 F.4th 628, 638–39 (7th Cir. 2021) ("[W]e respect 'the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences.' " (citing *United States v. Reed*, 875 F.2d 107, 111 (7th Cir. 1989))); *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018) (explaining that Courts overturn jury verdicts "only when the record contains no evidence, regardless of how it is weighed, from which the factfinder could find guilt beyond a reasonable doubt") (internal quotations omitted); *Shorter*, 874 F.3d at 977–78 (rejecting defendant's sufficiency of the evidence arguments where "the government submitted a substantial amount of evidence to support the convictions"). Taken together, the evidence adduced at trial could permit a rational jury to find that Newton knowingly became a member of the conspiracy – the existence of which Newton does not challenge. This was evidenced by (1) her close working relationship with the Echavias, who stood at the helm of the conspiracy, and (2) the fact that Newton was privy (not to mention a party) to many of the acts

in furtherance the conspiracy. The record also permitted the jury to infer that Newton intended to advance the conspiracy given the fact that she repeatedly aided in fraudulent Medicare billing. Ultimately, the Government's evidence was more than sufficient to sustain the jury's verdict as to Count One. Newton's motion for acquittal is accordingly denied.

## II. Rule 33 New Trial Motion

### A. Legal Standard

A court may vacate a judgment and grant a new trial upon the defendant's motion "if the interest of justice so requires." *See* FED. R. CRIM. P. 33; *see also United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012). Unlike a motion for acquittal, the Court need not view the evidence in the light most favorable to the government and it may consider the credibility of the witnesses. *See United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). "A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); *see also United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) ("[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial."). However, "the exercise of power conferred by Rule 33 is reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016) (citing *United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990), amended 910 F.2d 467 (7th Cir. 1990)). In other words, the Court should grant a motion for a new trial only if "the evidence 'preponderates so heavily against the verdict that it would be a manifest injustice to let the guilty verdict stand.'" *Conley*, 875 F.3d at 399 (quoting *Reed*, 875 F.2d at 114); *see also Presbitero*, 569 F.3d at 706.

**B. Discussion**

Newton advances three arguments in support of her motion for a new trial. First, she maintains that the exclusion of Bolender's testimony deprived her of due process of law. Second, she challenges several alleged defects in the Government's *Santiago* proffer. Third, she contends that the cumulative effect of the foregoing trial errors prevented a fair trial, and purports to reassert – in the broadest terms possible – *all* of her previous motions, objections, and arguments made before, during, and after trial. The Court addresses each point in turn.

**i. The Exclusion of Bolender's Testimony**

Newton asserts that her inability to present the testimony of Norma Bolender, her colleague at Care Specialists, deprived her of due process of law. (Dkt. 243 at 10). To begin, she argues that the Government's refusal to immunize Bolender from future prosecution distorted the fact-finding process because Bolender "would have undermined nearly every aspect of the government's case." (*Id.* at 16). Among other things, Newton claims that Bolender would have explained that she, too, "would fill out forms using 'scratch notes' from [Mr. Echavia]," showing that Newton was not alone in writing visit notes for Mr. Echavia. (*Id.*). Newton appears to suggest that this testimony would somehow "directly contradict the prosecution's theory that Newton 'agreed to make up content' " for Mr. Echavia's patient visit notes. (*Id.* at 17). Per Newton, Bolender further would have testified that Mr. Echavia reviewed these visit notes "at some point after [the women] completed them," which Newton believes would show that her actions amounted to "nothing more than clerical data entry, or scribing." (*Id.*). She maintains that Bolender's testimony would have bolstered her defense because Bolender allegedly did not become aware of the "improper activities going on at" Care Specialists until "months before she left" the company – despite that fact that Bolender had "decades of industry experience." (*Id.* at

18; *see also id.* at 21 (explaining that "Bolender would testify that she had significantly more training and experience than Newton and [yet] did not put the pieces together until much later")).

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. The privilege may be "asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal proceeding or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 444–45 (1972). The privilege extends to answers that would themselves implicate the witness in a crime as well as those that would furnish a link in the chain of evidence needed to prosecute the witness for a crime. *Hoffman v. United States*, 341 U.S. 479, 486 (1951). In this case, Bolender's attorney advised her against testifying, and she asserted her Fifth Amendment right not to do so. Newton argues that the Government should have granted Bolender immunity and thus require her to testify – recognizing that discretion to confer immunity upon a witness is placed solely in the executive branch of the government rather than the judiciary. (Dkt. 243 at 11). *See also United States v. Herrera-Medina*, 853 F.2d 564, 568 (7th Cir. 1988) (citing *Pillsbury Co. v. Conboy*, 459 U.S. 248, 261 (1983)) ("Immunity is an executive prerogative. 'No court has authority to immunize a witness. That responsibility . . . is peculiarly an executive one.' "); *United States v. Hooks*, 848 F.2d 785, 799 (7th Cir. 1988) ("Congress has delegated the authority to grant "use immunity" solely to the executive branch of government.").

Despite Newton's foregoing arguments, binding precedent states that prosecutors have "significant discretion to decline immunity to a witness." *United States v. Davis*, 845 F.3d 282, 291–92 (7th Cir. 2016), *cert. denied*, 138 S.Ct. 65 (2017) (citing *United States v. Lake*, 500 F.3d 629, 633 (7th Cir. 2007) (internal quotation marks omitted)). Their refusal to do so "may amount

to a denial of due process . . . only in *very limited* circumstances." *United States v. Chapman*, 765 F.3d 720, 731 (7th Cir. 2014) (emphasis added). Per the Seventh Circuit:

> [T]he prosecutor's power to seek *or to refuse to seek* immunity is limited by the constitutional right to due process of the law. Accordingly, this appellate court will not review a prosecutor's immunization decisions in the absence of substantial evidence showing that the prosecutor's actions amounted to a *clear abuse of discretion* violating the due process clause. The prosecutor has abused his discretion when he intends to use his authority to *distort the judicial fact-finding process*.

*Id.* (citing *Hooks*, 848 F.2d at 799) (emphasis added). *See also Davis*, 845 F.3d at 292 (citing *United States v. Burke*, 425 F.3d 400, 411 (7th Cir. 2005)) (explaining same). Defendants thus bear a heavy burden when challenging the Government's decision not to grant immunity to a defense witness. *Cf. Davis*, 845 F.3d at 291–92 (explaining that "[e]ven in a case [where the Government *did* distort the fact-finding process by declining to grant immunity to a witness], a district court cannot simply order the government to immunize a defense witness") (citing *Chapman*, 765 F.3d at 732).

There is no evidence that the Government "distorted the judicial fact-finding process" by declining to grant immunity to Bolender in this case. This is because Bolender's testimony would not have been nearly as exculpatory as Newton suggests. For example, even accepting as true that Bolender was not subjectively aware of the criminal ongoings at Care Specialists for several years, this has no bearing on *Newton's* knowledge of and involvement in that same misconduct. Equally unpersuasive is Newton's notion that because Mr. Echavia allegedly reviewed falsified patient notes written by his employees, this behavior amounted to innocent "scribe" work. Even if Bolender testified to that effect, the idea that Mr. Echavia reviewed paperwork falsified by Newton to defraud Medicare would do nothing to exonerate Newton of her role in that crime. Similar

reasoning applies to Newton's claim that Bolender also wrote patient notes for Mr. Echavia. Even if true, this fact simply does not undermine the allegations that Newton presently faces.

More to the point, Bolender's testimony would have seriously *inculpated* Newton in the misconduct charged in the indictment. Bolender filed a whistleblower complaint in 2015 with Medicare authorities in which she reported "massive fraudulent activity and mismanagement going on at Care Specialists." (Dkt. 244-5 at 1 (further explaining that the Echavias were pursuing "untruthful and crooked" activities in violation of the law)). Bolender directly implicated Newton in her complaint, and in no uncertain terms. (*Id.* (naming Newton as a party "involved with fraudulent activity" at Care Specialists)). Bolender reported the following:

> **Mr. Echavia, RN hired Angelita Newton as his Administrative Assistant/ Secretary responsible to prepare and write his home visit note[s]. Most of the information [is] fabricated[.]** Example: Date/ Time of visit, place/location of visit, home bound status, assessment including vital signs, blood sugar reading, wound measurement, etc., submitting a home visit note without the actual visit in some cases the patient is in the hospital/ Rehab facility or has moved outside of the coverage area. The only time we found out that there is an overlapping of services is when the billing is rejected. Angelita Newton is under the command and supervision of Maria Luisa Echavia[.]
>
> [...]
>
> Maria Luisa Echavia [is the] current owner [and] administrator [of Care Specialists] . . . . She approves the chart for billing without the approval of the assigned visiting nurse, quality assurance nurse and agency supervisor. **The supervisory visit notes [concern visits that] are not taking place. [They are] fabricated in the office by Angelita Newton.**

(*Id.* at 1–2 (emphasis added)). Bolender went on to <u>repeatedly</u> implicate Newton during interviews with law enforcement agents investigating this case. For example, she told investigators that she "witnessed Newton completing blank forms 'all the time' for Ferdie's patients, and she also changed dates on visit notes" pursuant to orders from the Echavias. (Dkt. 244-4 at 2; *see also* Dkt. 244-7 at 3 (Bolender on record stating "[t]he visit notes were controlled by [Newton] and [Mrs.

18

Echavia]."); Dkt. 244-10 at 5–6 (Bolender explaining to investigators that Newton completed blank patient visit forms "all the time" under the direction of the Echavias)). Federal agents further learned the following information through an interview with Bolender:

> [Bolender] knows Newton completed some of [Mr. Echavia's] nursing notes because she could recognize Newton's handwriting on them. . . . **[Bolender] witnessed Newton making up visit notes to complete the chart.** [Bolender] added Newton was told to do this by [the Echavias]. . . . **[Newton] made up dates on visit notes as well.** [Mrs. Echavia] initially directed Newton to make up dates on the notes, but [Bolender] stated Newton knew how to create notes with false dates based on years of experience working in the home health field. **[Bolender] added Newton primarily changed the times on visit documentation for [Care Specialists].** When she performed quality assurance work on the notes, Newton noticed [Mr. Echavia's] visit times overlapped between two patients. **[Newton] would change the times to make sure visit times didn't overlap or conflict with each other.**

(Dkt. 244-6 at 2, 4). In sum, Bolender repeatedly went on the record with investigators to provide details about how Newton falsified patient files. Her statements unequivocally link Newton to the fraud charged in the indictment. The Government certainly would have elicited testimony related to these prior statements had the defense called Bolender to the stand – which would have enhanced its *own* case, rather than Newton's.

Newton counters that "even if the government believed that Bolender would generally help rather than hurt their case against Defendant, does it matter? Exculpatory testimony need not overwhelmingly exonerate a Defendant to be favorable." (Dkt. 240-1 at 3; *see also id.* at 1–2 (explaining that Bolender's testimony generally would have helped contradict the Government's case in chief)). This argument misses the point. It is not enough for Newton to show that she could have benefitted in some way from Bolender's testimony, or that Bolender's testimony would have helped paint Newton in a more favorable light in certain minute respects. The relevant question is whether Bolender's absence "distorted the judicial fact-finding process" to such an extent that it amounted to an abuse of prosecutorial discretion not to grant her immunity.

*Chapman*, 765 F.3d at 731. Newton has failed to show that the Government so abused its discretion in this case. Its decision not to immunize Bolender does not warrant a new trial.

Newton next argues that the Court improperly allowed Bolender to plead the Fifth Amendment. (Dkt. 243 at 26–27). By way of background, Bolender invoked her right against self-incrimination upon learning that she could be implicated in the underlying criminal activity, (Trial Tr. 584:17–585:9 ("You have a right not to incriminate yourself. . . . [W]e did see some paperwork with your name on it this morning when a witness was testifying.")), and conferring with court-appointed counsel, Gerardo Gutierrez (*id.* at 503:17–22, 581:2–582:23). Newton highlights that Mr. Gutierrez opined on the record "that there existed an indicia of an absolute bar to prosecution [due to the relevant statute of limitations] that *might* allow Bolender to testify without recourse having to invoke the Fifth Amendment." (Dkt. 243 at 26 (emphasis added)). Yet, in Newton's framing of the facts, the Court failed to pay even "*some* attention" to this issue since the Court did not convene "a brief colloquy or hearing to determine whether the statute of limitations barred Bolender from prosecution." (*Id.* at 26–27 (emphasis in original)). Newton maintains that the Court "ignored" Mr. Gutierrez's point about the statute of limitations "and instead advised the witness itself" – and that this ultimately calls for a new trial. (*Id.* at 26). Newton sets forth these arguments even though following his review of the facts, Mr. Gutierrez determined that Bolender indeed faced a risk of prosecution. (*See, e.g.*, Trial Tr. at 581:2–582:23).

The Fifth Amendment privilege against compelled self-incrimination "must be accorded liberal construction." *Hoffman*, 341 U.S. at 486. The privilege "not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Id.*; *see also Kastigar*, 406 U.S. 444–45. "To be privileged by the Fifth

Amendment to refuse to answer a question, the answer one would give if one did answer it (and answer it truthfully) must have some tendency to subject the person being asked the question to criminal liability." *Evans v. City of Chicago*, 513 F.3d 735, 743 (7th Cir. 2008) (citing *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663–64 (7th Cir. 2002)). "The right to assert the Fifth Amendment privilege depends upon the possibility, not the likelihood of prosecution." *Hillman v. City of Chicago*, 918 F. Supp. 2d 775, 778 (N.D. Ill. 2013) (citing *In re Folding Carton Antitrust Litig.*, 609 F.2d 867, 872 (7th Cir. 1979)). A witness is not required to prove the possibility of prosecution, so whenever "there is any basis for a prosecution, the Fifth Amendment protection applies." *In re Corrugated Container Antitrust Litig.*, 661 F.2d 1145, 1152 (7th Cir. 1981), *aff'd sub nom. Pillsbury Co. v. Conboy*, 459 U.S. 248 (1983). "The possibility of prosecution is foreclosed only by the existence of an absolute bar to prosecution as indicated by a statute of limitations, immunity, or double jeopardy." *Hillman*, 918 F. Supp. 2d at 778 (citing *In re Folding Carton*, 609 F.2d at 872). "[T]o the extent any doubt exists regarding the validity of the claimed Fifth Amendment privilege, the benefit of that doubt must go to the witness asserting the privilege." *Corrugated Container*, 661 F.2d at 1151.

From the outset, the Court would clarify that it did not "ignore" the statute of limitations issue when it allowed Bolender to invoke the Fifth Amendment. Newton appears to overestimate the strength of Mr. Gutierrez's statements on this point. At no time did Mr. Gutierrez assert that there plainly existed an absolute bar against Bolender's future prosecution; instead, he opined that Bolender might in fact face continuing exposure depending on when she last engaged in potential misconduct with Care Specialists. The relevant portion of the record reads as follows:

> MR. GUTIERREZ: I have spoken to Ms. Bolender. . . . I told her . . . that because she was terminated, according to her own letter, on January 30th, 2015, I thought – and **I told her I believed that the five-year statute of limitations would have <u>ordinarily</u> ran <u>unless</u> there was conduct by her after that date. So I told her I**

**didn't know if there was or wasn't. . . .** I thought that it was a very slim opening for whatever exposure she may have, but that ultimately –

**THE COURT:** Her signature is on – her writing is on –

**MR. GUTIERREZ:** Right.

**THE COURT:** – a number of these documents that – they are clearly showing [her] to be part of this scheme –

**MR. GUTIERREZ:** Yes.

**THE COURT:** – so that would be – I don't know what her involvement is with that–

**MR. GUTIERREZ:** Right.

**THE COURT:** – but certainly her name is on those documents.

**MR. GUTIERREZ:** It is on those documents, Judge. **And to the extent that any of those documents have a date after January 30th, 2015, <u>which would show a continuing exposure</u> . . . I told her that she either can claim a Fifth Amendment privilege,** or that if it was after the five-year statute of limitations, that the statute of limitation works as a bar to anything that she may or may not have been a party to prior to what would amount to February of 2020.

(Trial Tr. at 581:2–582:23 (emphasis added)). In sum, Mr. Gutierrez acknowledged that although Bolender had only a "slim opening" for exposure, her handwriting was nonetheless present on documents that could implicate her in a crime. He thus informed Bolender that she could validly plead the Fifth Amendment to avoid self-incrimination as to any misconduct occurring after January 30th, 2015. Furthermore, rather than simply ignoring the potential tension between Bolender's Fifth Amendment rights and the statute of limitations bar to prosecution, the Court treated it with due care by (1) considering the facts in this case, which showed that Bolender might have risked self-incrimination by taking the stand, (2) appointing counsel to advise Bolender of her rights, (*id.* at 585:6–9 ("[I]n an abundance of caution, I've gotten Mr. Gutierrez here so that you can stop the questioning and talk to him if you think that's appropriate because . . . I want to make sure I'm protecting your constitutional rights.")), and (3) providing Bolender ample

opportunity to meet with counsel. Indeed, only after privately consulting with Mr. Gutierrez about the statute of limitations versus self-incrimination issue <u>twice</u>, (*id.* at 581 (summarizing Mr. Gutierrez's first meeting with Bolender), 586 (indicating that Bolender wished to meet with Mr. Gutierrez a second time)), Bolender decided that it was in her best interest not to testify for the defense, (*id.* at 591:24–25).[1] In context, Newton's argument that the Court ignored the statute of limitations issue both strains credulity and demonstrates a misapprehension of the record.

Moving on, binding case law makes clear that Bolender permissibly invoked her right not to testify in this case. The record reflects that Bolender worked at Care Specialists in various roles between 2010 or 2011 and January 2015. (*E.g.*, Dkt. 244-3 ¶ 5). Several of Bolender's colleagues – including Newton, the Echavias, and Onate – were indicted for their roles in an expansive Medicare fraud scheme at Care Specialists. The Echavias and Onate have pled guilty to the criminal indictment in this case, and Onate entered a cooperation agreement with the government. (*See* Dkts. 173 (Mr. Echavia's Plea Agreement), 175 (Mrs. Echavia's Plea Agreement); Trial Tr. at 375:21–23 (Onate testifying about his guilty plea), 380:23–381:3 (Onate testifying about his cooperation agreement)). Based on her own filings, Newton apparently recognizes that Bolender likely knew of criminal conduct taking place at Care Specialists. (*See, e.g.*, Dkt. 244-2 ¶ 15 (draft stipulation stating Bolender was aware that a Care Specialist employee changed diagnosis codes in visit notes); ¶ 16 (stating Bolender was aware of inpatient overlap issues in internal files and that a Care Specialists employee changed diagnosis codes when such issues arose)). Bolender's interviews with federal agents also revealed her knowledge of and involvement in conduct charged

---

[1] To the extent that Newton alleges that the Court ignored Mr. Gutierrez's assessment of the statute of limitations issue and "advised the witness itself," (Dkt. 243 at 26), this is simply untrue. At no point did the Court advise Bolender on the statute of limitations issue or provide her any form of legal counsel. The record shows that the Court <u>only</u> provided Bolender an explanation of her right against self-incrimination in general terms. (Trial Tr. at 584:17–24, 585:13–586:6). The Court informed Bolender that it was not aware what her potential exposure was, (*id.* at 585:1–3), and that Mr. Gutierrez was on standby to advise her and help ensure protection of her constitutional rights, (*id.* at 585:6–9).

as part of the conspiracy. (*E.g.*, Dkt. 244-4 at 3 (documenting Bolender's statement to investigators that her colleagues "change[d] the diagnoses on forms in order to affect reimbursement amounts from Medicare"); Dkt. 244-8 at 2 (documenting Bolender's admission that she, herself, falsely completed documents under the Echavias' direction; "[Bolender] was asked why the hospital records and [company] notes did not match . . . . and [Bolender] stated because the information on the scratch paper [Mr. Echavia] gave [her] did not reflect the hospital records")). As discussed above, evidence implicating Bolender in the underlying fraud also came before the Court itself during trial. (*See* Trial Tr. 582:3–15 ("[Bolender's] signature is on – her writing is on . . . a number of these documents that . . . are clearly [shown] to be part of the [criminal] scheme.")).

Under these circumstances, it was clear that Bolender was vulnerable to prosecution. Therefore, Bolender was within her rights to invoke the Fifth Amendment upon the advice of counsel, and the Court appropriately accepted her decision to do so.[2] *E.g.*, *Chapman*, 765 F.3d at 789 ("[T]he witness's testimony need only 'make [the witness] vulnerable to prosecution.' " (quoting *United States v. Mabrook*, 301 F.3d 503, 506 (7th Cir. 2002))); *Corrugated Container*, 661 F.2d at 1152 (explaining the privilege may be invoked whenever "there is any basis for a prosecution").

### ii. Alleged Deficiencies Concerning the *Santiago* Proffer

Newton raises several issues pertaining to the Government's *Santiago* proffer. First, she contends that "the government repeatedly failed to show that both the defendant and the [co-conspirator] declarant[s] were members of the same conspiracy." (Dkt. 243 at 36). This argument

---

[2] The Court further notes that granting Newton's motion for a new trial based on Bolender's invocation of the Fifth Amendment would lead to an impractical result for the same reasons discussed above, in the context of the Government's refusal to grant use immunity. Because Bolender's testimony would have done little or nothing to exculpate Newton of the charged conspiracy, her decision not to testify did not meaningfully alter the outcome at trial. result in "unfair and unnecessary prejudice" to Newton in the eyes of the jury. This only further warrants against calling a new trial on Newton's behalf.

fails because evidence adduced at trial permitted the jury to conclude that Newton took part in a criminal conspiracy at Care Specialists along with the Echavias and Onate. (*See, e.g.*, Trial Tr. at 329:2–11 (Onate testifying that Newton and Mrs. Echavia worked closely together at the company), 369:24–373:13 (Onate describing an incident involving Newton and Mrs. Echavia wherein his electronic patient notes were altered to look worse than he initially wrote them), 657:6–10 (Santos stating that she observed Newton writing Mr. Echavia's patient notes), 679:1–680:4 (Demata explaining that he saw Newton complete blank patient visit forms bearing Mr. Echavia's signature "all the time"); *see also, e.g.*, *id.* at 350:13–352:23 (Onate noting that he voiced concern to Newton about Care Specialists' patients asking for money), 484:15–21 (Rivera recalling that patients called the office to ask for money, and that she transferred such calls to Newton or Mrs. Echavia). Binding case law states that an individual can be implicated in a conspiracy based on "the activities surrounding" her, *see United States v. Salinas*, 763 F.3d 869, 877 (7th Cir. 2014), as well as the length of time that the Defendant spent around ongoing criminal activity, *United States v. Dingle*, 862 F.3d 607, 614 (7th Cir. 2017). Moreover, "a single act will suffice [to show that an individual was involved in a criminal enterprise] if circumstances show the act was intended to advance the conspiracy." *United States v. Cejas*, 761 F.3d 717, 727 (7th Cir. 2014). Given the facts of this case, the Government successfully showed that Newton and the declarants at issue were members of the same conspiracy.

Newton next argues that "the government repeatedly failed to establish the necessary foundation" for certain co-conspirator statements, including "statements from Onate, Onal, Rivera, and Santos, as it had failed to meet its burden in establishing that they too were members of the alleged conspiracy." (Dkt. 243 at 36–37). However, Newton's defense counsel waived this objection by failing to raise relevant objections concerning such co-conspirator statements at trial.

Next, Newton initially challenged the fact that "the government made no mention of Norma Bolender in their *Santiago* proffer, yet they elicited significant hearsay testimony from Onate regarding statements Bolender made to him regarding adjusting his visit notes." (Dkt. 243 at 37). As Newton concedes in her Reply brief, however, this argument necessarily fails because "a command is not hearsay because it is not an assertion of fact." (Dkt. 240-1 at 20 (citing *United States v. White*, 639 F.3d 331, 338 (7th Cir. 2011)); *see also* Dkt. 239 at 24 ("Onate's testimony describing directions/commands he received from Bolender, which are textbook nonhearsay statements not offered for the truth of the matter asserted.")). As such, Newton ultimately "concedes that [Onate's] testimony was proper" to the extent it related to Bolender's commands. (Dkt. 240-1 at 21).

Newton's final argument states that "a great deal of the testimony from Onal, Rivera, Santos, and Demata at trial regarding their own prior statements do not appear to have been made in furtherance of the alleged conspiracy, but rather involved rumors regarding the Echavias and Newton or vague recollections of their attempts to discover whether something was amiss." (Dkt. 243 at 37–38). Newton fails to cite to the record to substantiate this claim or refer the Court to specific issues with these witness' testimony. Because Newton neglected to meaningfully develop this argument or provide any reasoning as to why it calls for a new trial, it is dismissed.

### iii. Newton's "Additional Arguments"

Newton maintains that "the cumulative effect of the trial errors acted to deprive [her] of her constitutional right to a fair trial." (Dkt. 243 at 38). However, because the Court does not find that it committed any of the proposed errors, it also finds that there is no cumulative effect. *See, e.g.*, *Taylor*, 2019 WL 4410279, at *6.

Finally, Newton purports to "incorporate[] . . . by reference and expressly reassert[] and preserve[] all written pleadings, motions to suppress, severance motions, and all written or oral motions, objections, requests, and arguments made before, during, and after trial." (Dkt. 243 at 38). Newton fails to provide any rationale as to why the Court should consider this blanket reassertion of *all* her previous challenges – both oral and written – to the Government's case dating back to 2017. Nor does she cite a single precedential authority showing the propriety of such an expansive yet exceedingly vague request. Because "[t]his perfunctory incorporation provides no persuasive reason [for the Court] to revisit [its] pretrial and trial rulings," it declines to do so at this time. *See, e.g.*, *United States v. Hamdan*, No. 16-cr-252, 2018 WL 10435497, at *1 n.1 (N.D. Ill. Jan. 9, 2018).

## <u>CONCLUSION</u>

For the reasons explained above, the Court denies Newton's Motion for Judgment of Acquittal and for New Trial [243].

Virginia M. Kendall
United States District Judge

Date: November 29, 2021